IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KARL A. BOYTER, | § | |
| TDCJ #1582369, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-09-4132 |
| | § | |
| BRAZOS COUNTY, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

State inmate Karl A. Boyter (TDCJ #1582369, former TDCJ #692272, TDCJ #607208, Bureau of Prisons #05084-017, Brazos County #196853) has filed a complaint under 42 U.S.C. § 1983, alleging violations of his civil rights in connection with the conditions of his confinement at the Brazos County Jail. Pending before the Court is a motion for summary judgment by Brazos County and three county employees (Brazos County Sheriff Christopher Kirk, Jail Administrator Wayne Dicky, and Deputy Sheriff Jim Mann) [Doc. # 58]. Also pending is a motion for summary judgment by Dr. Rick Seabolt [Doc. # 59]. Boyter has submitted a lengthy response [Doc. # 60], to which Brazos County has filed a reply [Doc. # 61]. After reviewing all of the pleadings, and the applicable law, the Court **grants** the defendants' motions and dismisses this case for reasons that follow.

## I.    BACKGROUND

Boyter's allegations have been summarized previously [Doc. # 30] and will not be repeated at length here. To resolve the pending motions, it is sufficient to note that Boyter

is presently incarcerated in the Texas Department of Criminal Justice ("TDCJ") as the result of a felony conviction entered against him in Brazos County, Texas, on May 22, 2009. Boyter's civil rights complaint does not take issue with his conviction or the conditions of his confinement in TDCJ.  Rather, his complaint concerns the level of medical care that he received for a knee injury that he sustained while he was in custody at the Brazos County Jail in Bryan, Texas.  The pleadings and exhibits establish the following chronology of care that Boyter received for that injury.

Boyter was arrested on January 12, 2009, and charged with burglary of a habitation in Brazos County case number 09-01018-CRF-85.  Boyter acknowledges that, at the time of his arrest, he was on parole for more than one prison sentence from a prior conviction.[1] While he was in custody at the Brazos County Jail, Boyter was assigned to work as an "outside trusty" on the "road and bridge crew." [Doc. # 58, Exhibit 1, at 33].  According to the Daily Activity Log, this particular work detail was tasked to perform manual labor of various kinds, but was mainly assigned to clear brush and trash from the roadside. [Doc. # 60, Ex. 12].

---

[1]     Public records reflect that, in addition to the 20 year sentence that Boyter received for burglary of a habitation in Brazos County cause number 09-01018-CRF-85, he is presently serving three other sentences for forgery in Smith County cause number 1-91-157 (8 years); burglary of a habitation in Rusk County cause number CR-94-244 (15 years); and burglary of a habitation in Smith County cause number 241-0895-01 (10 years).  Boyter has several other prior convictions from Lubbock County, Texas, Florida, and South Dakota, as well as a federal conviction for unlawful possession of a firearm by a previously convicted felon. *See United States v. Boyter*, Crim. No. 5:01-0012-001 (N.D. Fla. Dec. 6, 2001).

Boyter alleges that, in March of 2009,[2] he injured his right knee while picking up trash and brush "out by the river." [Doc. # 1, at ¶ 14]. Boyter alleges that he was picking up some wood when "he slipped on a slight incline and a piece of board stuck in his right knee cap, causing him to fall and twist his right knee." [*Id.*]. Boyter's supervisor, Deputy Oscar Favilla, noticed that Boyter's knee was bloody and to let Boyter to let him know if his knee began to feel worse. [Doc. # 58, Ex. 1, at 39-40]. Boyter continued working that day, but took several breaks to sit in the van. [*Id.*]. Officer Favilla eventually escorted Boyter to the nurse's station at approximately 8:00 p.m., after the work crew returned to the Jail. [*Id.*]. A nurse examined the knee and determined that it did not look serious, but advised Boyter to return to the nurse's station if his pain became worse. [*Id.* at 41]. The nurse gave Boyter some "salve and stuff like that" to put on his knee. [*Id.*]. Boyter did not have any problem with the treatment he received that evening. [*Id.*]. Boyter returned to work as a trusty with the road and bridge crew the following day. [*Id.* at 44].

Boyter continued to perform manual labor as an outside trusty until April 8, 2009. [Doc. # 60, Ex. 12]. On that day, Boyter reported to the nurse's station and complained of pain stemming from a knee injury that he suffered "three weeks ago" while working as an outside trusty. [Doc. # 58, Exs. 2 & 3]. Medical records show that, on that same day, x-rays

---

[2]     Initially, Boyter alleged that the injury occurred in February of 2009. [Doc. # 1, at ¶ 13]. When asked to provide a more definite statement of his claims, Boyter did not supply an exact date. [Doc. # 6, at 3-4]. In his reply, Boyter estimates that the injury occurred on March 7, 2009. [Doc. # 60, at 20]. A Daily Activity Log submitted as an exhibit by Boyter reflects, however, that March 7, 2009 and March 8, 2009, were "off" days. [Doc. # 60, Ex. 12]. Medical records indicate that Boyter told health care providers that his knee injury occurred on or about March 20, 2009. [Doc. # 58, Ex. 10].

were taken of Boyter's right knee and lab work was performed to check for signs of an infection. [Doc. # 58, Ex. 4]. The x-ray was "normal" and the technician observed no evidence of a fracture or any type of foreign matter in the leg. [*Id.*]. Likewise, the lab work returned normal results and no evidence of an infection. [Doc. # 58, Ex. 5].

Boyter returned to work on the road and bridge crew during the week of April 13, 2009. [Doc. # 60, Ex. 12]. On April 21, 2009, however, Boyter submitted a written request for medical treatment for pain in his right knee. [Doc. # 58, Ex. 6]. The following day, on April 22, 2009, Boyter was examined in the Jail clinic by Nurse Pillows. [Doc. # 58, Ex. 1, at 53-54]. Nurse Pillows referred Boyter for evaluation by a medical doctor. [*Id.* at 54]. On April 23, 2009, Brazos County officials transported Boyter to "St. Joseph's Express Care."[3] [Doc. # 58, Ex. 7]. The examining physician reportedly told Boyter that he "[might] have done some damage to [his] knee." [Doc. # 58, Ex. 1, at 55]. Because knee injuries were "beyond his field," the doctor referred Boyter to a specialist. [*Id.*]. The doctor treated Boyter with an "Ace bandage" for the knee and told him to "keep it elevated." [*Id.* at 56].

Consistent with the recommendation from St. Joseph's Express Care, officials at the Brazos County Jail located an orthopedic specialist and scheduled an examination for Boyter's injured right knee. On May 8, 2009, Brazos County officials transported Boyter to the Bryan/College Station office of Dr. Rick Seabolt, who is a board certified specialist in orthopedic surgery. [Doc. # 58, Ex. 8; Doc. # 59, Ex. 1]. Dr. Seabolt noted that Boyter's

---

[3]      The parties do not provide any information about St. Joseph's Express Care, but it appears to be affiliated with the St. Joseph Health System in Bryan, Texas.

"ligamentous exam was felt to be stable by the physician he saw at St. Joseph." [Doc. # 59, Ex. 1 at 2].  Dr. Seabolt observed some swelling around "the quadriceps tendon, but no swelling in the knee joint."  [*Id.*].  Dr. Seabolt determined that Boyter's knee ligament was "stable" and that the injury was likely a "quadriceps contusion" that would heal on its own with time.  [*Id.*].  Dr. Seabolt recommended ice and ibuprofen, along with stretching exercises, but he advised Boyter to schedule a "follow up" appointment "if he did not get better."  [*Id.*].  After this examination, Boyter returned to the Brazos County Jail.

On May 17, 2009, Boyter submitted another written request for medical treatment, reporting that his right knee had "gotten more painful" and that he could "barely stand on it at times."  [Doc. # 58, Ex. 9].  Boyter was examined by a nurse at the Jail on May 18, 2009.  [Doc. # 58, Ex. 10].  On May 19, 2009, Brazos County officials returned Boyter to St. Joseph's Express Care. [Doc. # 58, Ex. 11].  The treating physician (Dr. Howard) contacted Dr. Seabolt by telephone. [Doc. # 59, Ex. 1, at 3].  Dr. Howard noted that Boyter's knee was "stable" and that his laboratory tests were "normal."  [Doc. # 58, Ex. 12].  Dr. Seabolt recommended that Boyter "continue the use of ibuprofen for one week and, if there was still a concern, he was to return to [Dr. Seabolt's] office for additional evaluation and possible steroid injection." [Doc. # 59, Ex. 1, at 3].

On May 22, 2009, Boyer entered a guilty plea to the burglary charges that were filed against him in Brazos County case number 09-01018-CRF-85, stemming from his January 12, 2009 arrest.  As a result, the 85th District Court for Brazos County, Texas, sentenced Boyter to a term of 20 years' imprisonment.  After the judgment was entered, Boyter

remained incarcerated at the Brazos County Jail pending a transfer to TDCJ.

On May 25, 2009, Boyter contacted the Jail medical department and asked to see Dr. Seabolt again.  [Doc. # 58, Ex. 13].  The Jail medical department scheduled an appointment for him and, on June 2, 2009, Boyter returned to Dr. Seabolt's office for a second evaluation. [Doc. # 58, Ex. 14].  During this visit, Dr. Seabolt treated Boyter's knee with a steroid injection and discussed the possibility of surgery if his injury did not respond to a "conservative treatment" regimen:

> Mr. Boyter returned to my office on June 2, 2009, for a repeat evaluation.  He was not getting any better, and had an effusion or swelling in his knee at that time with tenderness along his medial joint line.  Although his ligamentous exam was stable, his continued complaints were concerning for internal derangement (meniscus tear or chondral injury) so he was given a steroid injection to reduce the swelling, promote healing, and see how his condition would respond.  Some patients get good relief from such an injection and do not need any further treatment.  It is certainly appropriate to address a problem with such conservative treatment before moving to surgery.  Other patients go on to arthroscopy if they do not get adequate relief.  I discussed with [Boyter] that he would need a scope to assess and possibly repair any damage discovered if he did not get any improvement from the injection.

[Doc. # 59, Ex. 1, at 3].  In the meantime, Dr. Seabolt recommended that Boyter continue to elevate the knee and take ibuprofen for pain, but to return for another appointment if he did not get "significant relief." [*Id.*].

Boyter continued to stay in custody at the Brazos County Jail while awaiting a transfer to state prison.  On June 14, 2009, Boyter submitted a written request for additional treatment from Dr. Seabolt, referencing a new problem with his leg:

> I am still having problems with my leg.  I need to see Dr. Seabolt again to possibly have my knee scoped.  My knee and [calf] [are] still swollen.  Now

6

> there is a knot in my [calf] that is getting larger and is tender to the touch.
> Request to see the doctor as soon as possible.

[Doc. # 58, Ex. 15].  On June 18, 2009, a nurse at the Jail observed that Boyter's leg was

swollen and that he had a large bump on his calf.  [Doc. # 58, Ex. 17].  The Jail medical

department scheduled an appointment with Dr. Seabolt for the following day, on June 19,

2009. [*Id.*].   Boyter, however, was not transported to Dr. Seabolt's office as scheduled.

Boyter filed a grievance, complaining that he missed his appointment because security staff

removed him from the transport list.  [Doc. # 58, Ex. 18].  In response to Boyter's grievance,

a jail official explained that Boyter's June 19, 2009 appointment was rescheduled to June 30,

2009, due to a "conflict in scheduling[.]" [Doc. # 58, Ex. 19].

Boyter saw Dr. Seabolt for his scheduled appointment on June 30, 2009. [Doc. # 58,

Exs. 16 & 17].   During that appointment, Dr. Seabolt determined that Boyter probably

needed arthroscopic surgery because the knee had "fail[ed] to respond to conservative care."

[Doc. # 58, Ex. 17].  First, however, Dr. Seabolt scheduled an MRI of Boyter's lower leg to

evaluate the lump on Boyter's calf:

> I next saw Mr. Boyter on June 30, 2009, for follow-up.  He said that the
> [steroid] injection helped a little at first, but that it wore off quickly and he was
> the same as before.  At that point I decided that he needed to go ahead and
> have an arthroscopic surgery to assess the damage in his knee.  The
> complicating factor at that visit, however, was that he had a large mass in his
> calf which was new from his prior visits.  Before going to surgery, I wanted
> to assess his new calf mass with an MRI to determine if anything needed to be
> done to that and make sure it was nothing malignant.  I told him at that time
> that he did need to have his knee scoped to assess the damage but that such a
> procedure could be done after an MRI. . . . .

[Doc. # 59, Ex. 1, at 4].  Bryan had an MRI of his right lower leg on July 7, 2009. [Doc. # 58,

Exs. 22-23].  The MRI revealed "a large hematoma."  [Doc. # 59, Ex. 1, at 4].  After reviewing the results of the MRI, Dr. Seabolt recommended arthroscopic surgery for Boyter's knee on July 13, 2009.  [Doc. # 58, Ex. 26; Doc. # 59, Ex. 1, at 4].  During that procedure, Dr. Seabolt also planned to make an incision and drain the hematoma on Boyter's calf. [Doc. # 58, Ex. 26; Doc. # 59, Ex. 1, at 4].  Shortly thereafter, Boyter's arthroscopic surgery was scheduled for July 29, 2009, which was Dr. Seabolt's "first available [appointment]."  [Doc. # 58, Ex. 26].

Boyter's knee surgery did not occur as scheduled.  Brazos County received a notice from the TDCJ Inmate Scheduling System on July 22, 2009. [Doc. # 58, Ex. 29].  The notice ordered Brazos County to transfer Boyter and eight other convicted felons into state custody on July 27, 2009. [Doc. # 58, Exs. 29 & 31].  Brazos County complied with the order and transported Boyter and the other prisoners to TDCJ on July 27, 2009. [Doc. # 58, Ex. 31]. As a result, Boyter's July 29, 2009 surgery was cancelled.  Boyter eventually had arthroscopic knee surgery on October 23, 2009, while in state custody at the University of Texas Medical Branch ("UTMB") Hospital in Galveston. [Doc. # 58, Ex. 1 at 200].

In his pending civil rights complaint, Boyter blames Dr. Seabolt for delaying his access to surgery.  Boyter alleges that Dr. Seabolt demonstrated "gross incompetence" by performing a "recklessly inadequate examination" of his right knee during his initial appointment on May 8, 2009.  Boyter reasons that if Dr. Seabolt had recommended surgery after this initial examination, then he could have had the procedure before being transferred to TDCJ.  By delaying surgery, Boyter maintains that Dr. Seabolt acted with deliberate

8

indifference and reckless disregard for his constitutional right to receive reasonable and adequate medical care.

Boyter also blames Brazos County for the failure to provide him with prompt knee surgery. Boyter complains that Brazos County failed to adopt sufficient policies to provide reasonable and adequate medical care. Boyter claims that, as a result of deficient policies, he was denied prompt knee surgery while in custody at the Jail and his access to necessary treatment was delayed until after he was transported to TDCJ. In particular, Boyter complains that Brazos County does not have an adequate insurance policy to cover medical costs and treatment of detainees when such treatment is needed from specialists "outside the Jail."

In addition, Boyter complains that supervisory officials at the Brazos County Jail interfered with his access to medical treatment by transferring him to TDCJ on July 27, 2009, thereby forcing him to cancel the surgery scheduled by Dr. Seabolt on July 29, 2009. Boyter alleges that Sheriff Kirk, Jail Administrator Dicky, and Chief Deputy Jim Mann intentionally transferred him to TDCJ on July 27, 2009, so that Brazos County would not have to pay for the procedure.

Boyter complains that, by failing to provide adequate medical care, or delaying access to adequate medical care, the defendants violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution. Boyter seeks compensatory, punitive, and nominal damages for his physical pain, suffering, misery, anguish, anxiety, and incapacity. The defendants have filed separate motions for summary judgment, arguing that Boyter's

claims fail as a matter of law. The parties' contentions are addressed below under the governing standard of review.

## II.  STANDARD OF REVIEW

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure. Under this rule, a reviewing court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A fact is "material" if its resolution in favor of one party might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Id.*

If the movant demonstrates the absence of a genuine issue of material fact, the burden shifts to the non-movant to provide specific facts showing the existence of a genuine issue for trial. *See Matsushita*, 475 U.S. at 587. In deciding a summary judgment motion, the reviewing court must "construe all facts and inferences in the light most favorable to the nonmoving party." *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010) (internal citation and quotation marks omitted). However, the non-movant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *Little v. Liquid Air Corp.*, 37

F.3d 1069, 1075 (5th Cir. 1994) (en banc).  Further, the court has no obligation under Rule 56 "to sift through the record in search of evidence to support a party's opposition to summary judgment." *Adams v. Travelers Indem. Co.*, 465 F.3d 156, 164 (5th Cir. 2006) (quotation omitted).

The plaintiff proceeds *pro se* in this case.  Courts construe pleadings filed by *pro se* litigants under a less stringent standard than those drafted by attorneys.  *See Haines v. Kerner*, 404 U.S. 519 (1972); *Bledsue v. Johnson*, 188 F.3d 250, 255 (5th Cir. 1999). Pleadings filed by a *pro se* litigant are entitled to a liberal construction that affords all reasonable inferences which can be drawn from them.  *See Haines*, 404 U.S. at 521; *see also United States v. Pena*, 122 F.3d 3, 4 (5th Cir. 1997) (citing *Nerren v. Livingston Police Dept.*, 84 F.3d 469, 473 & n.16 (5th Cir. 1996)).  Nevertheless, "the notice afforded by the Rules of Civil Procedure and the local rules" is considered "sufficient" to advise a *pro se* party of his burden in opposing a summary judgment motion.  *See Martin v. Harrison County Jail*, 975 F.2d 192, 193 (5th Cir. 1992).

## III.   DISCUSSION

Boyter filed the complaint in this case under the civil rights statute found at 42 U.S.C. § 1983, which provides a private right of action for damages to individuals who are deprived of "any rights, privileges, or immunities" protected by the Constitution or federal law by any person acting under the color of state law.  To establish liability under § 1983, a civil rights plaintiff must satisfy two elements:  (1) state action, *i.e.*, that the conduct complained of was

committed under color of state law, and (2) a resulting violation of federal law, *i.e.,* that the conduct deprived the plaintiff of rights secured by the Constitution or laws of the United States. *See Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992); *Baker v. McCollan*, 443 U.S. 137, 142 (1979). Boyter alleges that he was denied medical care in the form of arthroscopic knee surgery, or that adequate medical care was delayed, in violation of the Eighth Amendment and the Fourteenth Amendment to the United States Constitution.

Brazos County contends that Boyter cannot establish the essential elements of a claim under 42 U.S.C. § 1983, because he was not denied his constitutional right to medical care while he was a Jail detainee. The individual defendants join this argument. Dr. Seabolt maintains further that, as a physician in private practice, he was not a state actor for purposes of making a claim under § 1983. In addition, Sheriff Kirk, Deputy Mann, and Administrator Dicky contend that they are entitled to qualified immunity because there is no evidence that Boyter's transfer to TDCJ was objectively unreasonable under the circumstances. These arguments are addressed in turn, beginning with Boyter's claims against Dr. Seabolt.

### A.     Boyter's Claims Against Dr. Seabolt

Boyter complains that Dr. Seabolt should have scheduled him for arthroscopic surgery immediately after his initial examination on May 8, 2009. Dr. Seabolt contends that Boyter's civil rights claim fails because, as a privately employed physician, he was not a state actor for purposes of liability under 42 U.S.C. § 1983 and was not acting under color of state law. Dr. Seabolt denies that he contributed to the delay in treatment or that he failed to provide adequate care. Dr. Seabolt contends, in that regard, that he treated Boyter at all times with

"dignity, concern, and respect," and did not ignore his complaints or fail to address them by following the appropriate standard of care. [Doc. # 59, Ex. 1 at 3, 3-4]. Because it is undisputed that Dr. Seabolt is a private practitioner with no formal ties to Brazos County, the Court first examines whether he was acting under color of state law when he provided medical treatment to Boyter.

### 1.    Dr. Seabolt's Status as a Private Physician

As noted above, 42 U.S.C. § 1983 affords a remedy for constitutional deprivations perpetrated by state actors or individuals acting under color of state law.  The Supreme Court has explained that, according to the traditional definition of "acting under color of state law," the defendant in a § 1983 action must have "exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)).  In other words, "the deprivation must be caused by the exercise of some right or privilege created by the [s]tate or by a rule of conduct imposed by the [s]tate or by a person for whom the State is responsible."  *Lugar v. Edmundson Oil Co.*, 457 U.S. 922, 936 (1982).  This means that "the party charged with the deprivation must be a person who may fairly be said to be a state actor," that is, one who is in fact a state official, one who "has acted with or has obtained significant aid from state officials," or one whose "conduct is otherwise chargeable to the State."  *Id.* at 937.

"State employment is generally sufficient to render the defendant a state actor." *West*, 487 U.S. at 49.  "It is firmly established that a defendant in a § 1983 suit acts under color of

state law when he abuses the position given to him by the [s]tate." *Id.* at 49-50 (citing

*Monroe v. Pape*, 365 U.S. 167, 172 (1961)).  "Thus, generally, a public employee acts under

color of state law while acting in his official capacity or while exercising his responsibilities

pursuant to state law."  *West*, 487 U.S. at 50 (citations omitted).  By contrast, private

individuals generally are not construed to act under color of law, and accordingly, are not

considered state actors.  *Lugar*, 457 U.S. at 941.  In that respect, private conduct, "no matter

how discriminatory or wrongful," is not actionable under § 1983. *Cornish v. Correctional*

*Servs. Corp*., 402 F.3d 545, 549 (5th Cir. 2005) (citing *Richard v. Hoechst Celanese Chem.*

*Group, Inc*., 355 F.3d 345, 352 (5th Cir. 2003) (quoting *American Mfrs. Mut. Ins. Co. v.*

*Sullivan*, 526 U.S. 40, 50 (1999)).  Private action may be deemed state action, for purposes

of liability under § 1983, only where the challenged conduct is "fairly attributable to the

[s]tate." *Lugar*, 457 U.S. at 937.

      The Supreme Court has utilized a number of tests for deciding whether a private

actor's conduct can be fairly attributable to the State. *See Cornish*, 402 F.3d at 459 (citations

omitted) (summarizing the tests).[4]  In this instance, Boyter alleges that Dr. Seabolt was a state

---

[4]      The Court recognizes that there are several other tests in addition to the one that examines
whether a private entity is performing a public function.  Under the "state compulsion test,"
a private actor's conduct is attributable to the state when it exerts coercive power over the
private entity or provides significant encouragement. *See Cornish*, 402 F.3d at 459-50 (citing
*Adickes v. S.H. Kress & Co*., 398 U.S. 144, 170-71 (1970)). The "nexus" or "state action
test" considers whether the state has inserted "itself into a position of interdependence with
the [private actor, such] that it was a joint participant in the enterprise." *Id.* at 550 (quoting
*Jackson v. Metro. Edison Co*., 419 U.S. 345, 357-58 (1974) (citation omitted)). In addition,
under the "joint action test," private actors will be considered state actors where they are
"willful participant[s] in joint action with the State or its agents." *Id.* at 550 (quoting *Dennis*
(continued...)

14

actor because he performed a public function pursuant to a contractual relationship with Brazos County.  Boyter fails to establish, however, that Dr. Seabolt is liable in this context.

It is true that, in certain cases, a private physician may be deemed to act under state law when providing medical treatment to prisoners.  In *West v. Atkins*, 487 U.S. 42, 57 (1988), the Supreme Court held that a private physician who was employed by contract to provide medical services to state prison inmates was acting under the color of state law for purposes of § 1983.  In the *West* case, the Supreme Court emphasized that it was the function of the physician within the state system, and not the precise terms of his employment, that were determinative of state action:

> It is the physician's function within the state system, not the precise terms of his employment, that determines whether his actions can fairly be attributed to the State.  Whether a physician is on the state payroll or is paid by contract, *the dispositive issue concerns the relationship among the State, the physician, and the prisoner*.  Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoner of the means to vindicate their Eighth Amendment rights.  The State bore an affirmative obligation to provide adequate medical care to West.  The State delegated that function to respondent Atkins; and respondent voluntarily assumed that obligation by contract.

487 U.S. at 55-56 (emphasis added).  The Supreme Court later clarified that, in the *West* decision, "the [s]tate was constitutionally obligated to provide medical treatment to injured inmates, and the delegation of that traditionally exclusive public function to a private

---

[4](...continued)
> *v. Sparks*, 449 U.S. 24, 27 (1980)).  The Court does not consider these additional tests because the plaintiff does not show that they are relevant under the facts of this case.  In that regard, the plaintiff has not disputed Dr. Seabolt's contention that he was a private actor, and not a state actor in this case.  [Doc. # 60].

physician gave rise to a finding of state action." *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 55 (1999).  Thus, this Court must focus on Dr. Seabolt's role or "function" in relation to the Brazos County system to determine whether Brazos County delegated an affirmative obligation to provide medical care to Boyter.  *See, e.g., West*, 487 U.S. at 55-56.

Dr. Seabolt has provided a lengthy affidavit in response to Boyter's complaint. [doc. # 59, Ex 1].  Dr. Seabolt emphasizes that, as a medical doctor specializing in orthopedic surgery, he has maintained a private practice in the Bryan/College Station area of Texas since 2001.  Dr. Seabolt concedes that he examined Boyter on three separate occasions (on May 8, 2009, June 2, 2009, and June 30, 2009), but notes that each evaluation occurred at his private office.  Dr. Seabolt explains that he does not have a contract with Brazos County Jail to provide care for their inmates.  He does, however, accept the insurance plan used by Brazos County.  Dr. Seabolt has treated many other Brazos County inmates, both before and after Boyter, under this insurance plan.

According to Dr. Seabolt, Brazos County had no influence over the treatment that he provided.  Dr. Seabolt maintains that he scheduled Boyter for surgery on July 29, 2009, in the same manner that any other patient in his practice.  Dr. Seabolt insists that no officer or official from Brazos County has ever directed, controlled, or influenced the clinical judgments and decisions he has made regarding the course of Boyter's care.  Dr. Seabolt adds that he made all treatment decisions with respect to Boyter's care "based upon the exercise of my own independent professional judgment based on the clinical facts presented."  In that respect, Dr. Seabolt maintains that he was "never compelled or pressured to delay or

16

withhold care for Karl Boyter by any person whatsoever."

Boyter does not refute any of Dr. Seabolt's assertions about the nature of his practice or his status as a private actor.  [Doc. # 60].  Based on this record, Boyter's case is readily distinguishable from the holding in *West*.  Significantly, the private physician in *West* treated the plaintiff-inmate in the prison hospital, subject to all of the pressures and constraints resulting from security concerns.  *See West*, 487 U.S. at 57, n. 15 (noting that "[u]nlike the situation confronting free patients, the nonmedical functions of prison life inevitably influence the nature, timing, and form of medical care provided to inmates such as [the plaintiff]").  By contrast, Dr. Seabolt examined Boyter in his own private office and there is no evidence that any of his treatment decisions were influenced by state or county officials.  Moreover, the physician in *West* had contracted with the state to provide medical care to inmates in a state-prison hospital.  *See West*, 487 U.S. at 54.  Here, however, Dr. Seabolt was not employed by the Brazos County in any capacity, nor was he otherwise compelled to render medical services to Jail inmates.  In that respect, Dr. Seabolt's decision to treat Boyter as a patient was governed only by his acceptance of Brazos County's insurance plan, and was not dependent on any other authority.  Dr. Seabolt's decision to treat Boyter was, therefore, no different than his decision to treat any other private individual with an insurance policy.

Boyter does not allege facts or otherwise establish that Dr. Seabolt had a relationship with Brazos County that created an affirmative obligation to provide medical care of the sort at issue in *West*.  *See* 487 U.S. at 56; *see also Nunez v. Horn*, 72 F. Supp. 2d 24, 27 (N.D.N.Y. 1999) (holding that an orthopedic surgeon who performed medical services for

17

prisoners at a private hospital pursuant to a referral, but absent a formal agreement with prison officials, was not a state actor).  Thus, Boyter has not raised a genuine issue of material fact showing that Dr. Seabolt acted under color of state law when he accepted Boyter as a patient and provided treatment that was paid for by Brazos County's insurance plan.  Under these circumstances, Dr. Seabolt is not liable under 42 U.S.C. § 1983 and he is entitled to summary judgment on this issue.

Boyter's claim against Dr. Seabolt fails for alternative reasons.  Even assuming that Dr. Seabolt could be considered a state actor, Boyter has nonetheless failed to come forward with facts demonstrating a violation of his constitutional right to adequate medical treatment for reasons discussed briefly below.

### 2.        Boyter was not Denied Timely or Adequate Medical Care

Boyter alleges that Dr. Seabolt is liable under 42 U.S.C. § 1983 for denying  access to prompt medical care in violation of the Eighth and Fourteenth Amendments to the United States Constitution.  The chronology of medical treatment provided in this case, which is outlined in more detail above, refutes Boyter's claim that he was denied timely medical care in violation of the governing constitutional standards, which are described in more detail below.

The Eighth Amendment, which focuses on prohibiting conditions that are unduly punitive, applies primarily to prisoners who have been convicted and sentenced for an offense.  *See Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc).  Because

18

a pretrial detainee has not been duly convicted or sentenced, the constitutional rights of these inmates are protected by the Due Process Clause of the Fourteenth Amendment, *see Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525-26 (5th Cir. 1999), which dictates that "a pretrial detainee may not be punished." *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979) (explaining that "[d]ue process requires that a pretrial detainee not be punished," whereas a "sentenced inmate . . . may be punished, although that punishment may not be "cruel and unusual' under the Eighth Amendment").   Thus, the Supreme Court has articulated the following distinction when considering the claims of pretrial detainees:

> Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions. *See United States v. Lovett*, 328 U.S. 303, 317-318, 66 S. Ct. 1073, 1079-1080, 90 L. Ed. 1252 (1946). . . . [T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law. Where the State seeks to impose punishment without such an adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment.

*Bell*, 441 U.S. at 535 n.16 (quoting *Ingraham v. Wright*, 430 U.S. 651, 671-672, n.40 (1977)).   Boyter was not convicted of the burglary charges against him until May 22, 2009. To the extent that Boyter complains of harm that occurred while he was a pretrial detainee, his claim arises under the Fourteenth Amendment's Due Process Clause, rather than the Eighth Amendment.[5] *See Hare*, 74 F.3d at 639 (explaining that pretrial detainees and

---

[5]   Although he was on parole for prior felony convictions at the time of his arrest, Boyter's status as a pretrial detainee ended when he entered his guilty plea on May 22, 2009.  The Fifth Circuit has recognized that there is no significant distinction between pretrial detainees and convicted inmates concerning basic human needs such as medical care.  *See Gibbs v.*
(continued...)

convicted prisoners "look to different constitutional provisions for their respective rights to basic needs, such as medical care and safety").

The Fourteenth Amendment requires the state to provide for the "basic human needs" of pretrial detainees, including the right to adequate medical care. *Hare*, 74 F.3d at 639; *see also Thompson v. Upshur County*, 245 F.3d 447, 457 (5th Cir. 2001) ("[P]retrial detainees have a constitutional right, under the Due Process Clause of the Fourteenth Amendment, not to have their serious medical needs met with deliberate indifference on the part of the confining officials."). Because Boyter's complaint concerns an "episodic act or omission," he must demonstrate that the defendant acted with deliberate indifference to his serious medical needs. *Tamez v. Manthey*, 589 F.3d 764, 769 (5th Cir. 2009) (citing *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (en banc)).  To satisfy this standard, a plaintiff must allege facts showing that "the official had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference." *Hare*, 74 F.3d at 650.

The Fifth Circuit has stated that the deliberate-indifference standard is an "extremely high" one to meet. *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). "A prison official acts with deliberate indifference 'only if [(A)] he knows that inmates face a substantial risk of serious bodily harm and [(B)] he disregards that risk by

---

[5](...continued)
> *Grimmette*, 254 F.3d 545, 548 (5th Cir. 2001) (citing *Hare v. City of Corinth*, 74 F.3d 633, 643 (5th Cir. 1996) (en banc)).  In that regard, the same standard governs constitutional claims concerning medical care by pretrial detainees and convicted inmates.  *See id*. Therefore, the plaintiff's status as a pretrial detainee does not appear to make a meaningful difference under the circumstances of this case.

failing to take reasonable measures to abate it.'" *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (quoting *Farmer*, 511 U.S. at 847). "Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances." *Id.* (citations omitted). A showing of deliberate indifference requires the inmate to demonstrate that officials "'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Id.* (citations omitted).

As noted above, Boyter claims that he injured his knee at some point in March of 2009, while working as an outside trusty on the road and bridge crew. The medical records confirm that Boyter received prompt medical care at the Brazos County Jail in response to every written request. When Boyter first requested care for his injured knee on April 8, 2009, he was promptly treated with x-rays and lab work that same day. [Doc. # 58, Exs. 2-5]. When Boyter complained further about pain in his knee on April 21, 2009, a nurse at the Jail scheduled him for an evaluation at St. Joseph's Express Care, where he was treated on April 23, 2009. [Doc. # 58, Exs. 6-7]. After the treating physician at St. Joseph's Express Care recommended a specialist, Brazos County Jail officials promptly contacted Dr. Seabolt, who examined Boyter on May 8, 2009. [Doc. # 58, Exs. 7-8]. Dr. Seabolt determined that the knee was "stable" and elected to follow a conservative course of care. [Doc. # 59, Ex. 1, at 2-3]. When Boyter continued to complain of knee pain, Dr. Seabolt examined Boyter on two other occasions, on June 2, 2009, and June 30, 2009, and he also scheduled an MRI, which

was conducted on July 7, 2009, to further evaluate Boyter's lower leg. [Doc. # 59, Ex. 1 at 2-4]. After Dr. Seabolt reviewed the MRI results and recommended arthroscopic surgery on July 13, 2009, Brazos County promptly scheduled the procedure for the first available date on Dr. Seabolt's calendar, which was July 29, 2009. [Doc. # 59, Ex. 1 at 4].

Dr. Seabolt notes that the time between Boyter's initial examination on May 8, 2009, to the date of the scheduled surgery on July 29, 2009, was under three months. [Doc. # 59, Ex. 1 at 5]. Dr. Seabolt states that this is "not an unusual course of conservative therapy." [*Id.*]. Dr. Seabolt explains further that the recommended surgery was not performed "due to circumstances beyond [his] control" because Boyter was transferred to state prison on July 27, 2009. [*Id.* at 5-6]. Dr. Seabolt received notice of Boyter's transfer from the Brazos County Jail on July 28, 2009. [*Id.* at 6]. Dr. Seabolt insists that he had no other communications with the Jail or Brazos County personnel regarding Boyter's transfer to state custody. [*Id.*]. Dr. Seabolt maintains further that all scheduling decisions were based solely on his availability to see and treat Boyter, and were in no way controlled or modified by him for the purpose of delay. [*Id.*].

Defendant Wayne Dicky, who serves as the Administrator for the Brazos County Jail, concedes that Boyter was transferred to state custody on July 27, 2009, shortly before his scheduled surgery was about to occur. [Doc. # 58, Ex. 31]. Dicky explains that Brazos County complied with an order to transfer Boyter to TDCJ, which order was dated July 22, 2009, because there was no evidence that Boyter's surgery was "non-elective" or "urgent" and no information showing that Boyter's condition was "emergent." [Doc. # 58, Ex. 31].

Dr. Seabolt confirms in his affidavit that the scheduled procedure was "considered an elective surgery" because Boyter's condition was "not an emergency." [Doc. # 59, Ex. 1 at 4]. Boyter eventually had arthroscopic knee surgery on October 23, 2009, at the UTMB Hospital in Galveston.

Boyter complains that Dr. Seabolt performed an inadequate initial evaluation on May 8, 2009, and that he should have been scheduled for arthroscopic surgery right away. To the extent that Boyter disagrees with the level of care that he received, the Fifth Circuit has held repeatedly that mere disagreement with medical treatment does not state a claim for deliberate indifference to serious medical needs under the Eighth Amendment. *See Stewart v. Murphy*, 174 F.3d 530, 535 (5th Cir. 1999); *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997); *Spears v. McCotter*, 766 F.2d 179, 181 (5th Cir. 1985); *Young v. Gray*, 560 F.2d 201, 201 (5th Cir. 1977). Even assuming that a lapse in professional judgment occurred, any such failure amounts to mere negligence or malpractice, and not deliberate indifference. *See Harris v. Hegman*, 198 F.3d 153, 159 (5th Cir. 1999) (citing *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993)). Thus, allegations of negligence and medical malpractice will not suffice to demonstrate a constitutional violation. *See Gibbs v. Grimmette*, 254 F.3d 545, 549 (5th Cir. 2001); *see also Stewart*, 174 F.3d at 534 ("[A]lthough inadequate medical treatment may, at a certain point, rise to the level of a constitutional violation, malpractice or negligent care does not.").

To the extent that Boyter blames Dr. Seabolt for his failure to recommend surgery in a timely manner, a delay in medical care violates the constitution only if it is due to

deliberate indifference and the delay results in substantial harm. *See Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993). Boyter does not allege facts showing that he was refused care or that he was intentionally treated incorrectly with wanton disregard for his medical condition. Likewise, Boyter does not establish that the delay in care was unreasonable or that the decision to cancel the surgery was attributable to Dr. Seabolt. Accordingly, Boyter does not demonstrate that he was denied surgery, or that surgery was delayed, with deliberate indifference on Dr. Seabolt's part. Because Boyter has failed to raise a genuine issue of material fact on whether he was denied adequate medical care in violation of his constitutional rights, Dr. Seabolt is also entitled to summary judgment on this issue.

## B.  Claims Against Brazos County

Boyter has also filed suit against Brazos County Sheriff Kirk, Jail Administrator Dicky, and Deputy Mann in their official capacities as Brazos County employees, complaining that he was denied medical care because Brazos County would not pay for it.[6] The real-party-in-interest in an official-capacity suit is the governmental entity and not the named official. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Kentucky v. Graham*, 473 U.S.

---

[6]  Claims under 42 U.S.C. § 1983 may be brought against persons in their individual or official capacity, or against a governmental entity. *See Goodman v. Harris County*, 571 F.3d 388, 395 (5th Cir. 2009) (citing *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403 (1997)), *cert. denied*, — U.S. —, 130 S. Ct. 1143 (2010). "Personal-capacity suits seek to impose liability upon a government official as an individual while official-capacity suits 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Goodman*, 571 F.3d at 395 (quoting *Monell v. Dept. of Soc. Serv.'s of City of New York*, 436 U.S. 658, 690 n. 55 (1978)). Thus, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity." *Goodman*, 571 F.3d at 395 (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (citation omitted))

159, 165-66 (1985); *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).  Because

Brazos County is a defendant in this case, the official-capacity claims against the individual

defendants are dismissed as duplicative.

Brazos County contends that it is entitled to summary judgment on Boyter's civil

rights claim because there is no evidence of a constitutionally deficient policy for purposes

of establishing municipal liability under 42 U.S.C. § 1983.  Municipalities are deemed to be

"persons" susceptible to suit under § 1983.  *See Monell v. Dep't of Social Servs.*, 436 U.S.

658, 690 (1978).  Municipal liability, however, cannot be sustained under a theory of

*respondeat superior* or vicarious liability.  *Id.* at 691;  *Board of County Comm'rs of Bryan*

*County v. Brown*, 520 U.S. 397, 403 (1997).  A municipality is only liable under § 1983 for

acts that are "directly attributable to it 'through some official action or imprimatur.'" *James*

*v. Harris County*, 577 F.3d 612, 617 (5th Cir. 2009) (quoting *Piotrowski v. City of Houston*,

237 F.3d 567, 578 (5th Cir. 2001)).  For liability to attach, "the municipality must cause the

constitutional tort, which occurs 'when execution of a government's policy or custom,

whether made by its lawmakers or by those whose edicts or acts may fairly be said to

represent official policy, inflicts the injury.'" *Bolton v. City of Dallas*, 541 F.3d 545, 548 (5th

Cir. 2008) (quoting *Monell*, 436 U.S. at 694).

To hold a municipality liable under this standard, "a plaintiff must show, in addition

to a constitutional violation, that an official policy promulgated by the municipality's

policymaker was the moving force behind, or actual cause of, the constitutional injury."

*James*, 577 F.3d at 617.  The plaintiff must establish a "direct causal link" between the

municipal policy and the constitutional deprivation. *Id.* (citations and quotations omitted). This requires "direct causation" between the policy and the alleged violation. *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 848 (5th Cir. 2009) (internal quotations and citations omitted). This requires "more than a mere 'but for' coupling between cause and effect." *Fraire v. City of Arlington*, 957 F.2d 1268, 1281 (5th Cir. 1992) (citations omitted).

Pointing to the medical records that document Boyter's care, Brazos County maintains that there was no constitutional violation in this case. Brazos County contends further that Boyter cannot prevail because there is no evidence that an official policy (or lack thereof) was the moving force behind any alleged injury. Official policy, which establishes municipal culpability, "can arise in various forms." *Peterson*, 588 F.3d at 847. Official policy usually exists in the form of "written policy statements, ordinances, or regulations, but may also arise in the form of a widespread practice that is 'so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *James*, 577 F.3d at 617 (citations and quotations omitted)). "A policy is official only 'when it results from the decision or acquiescence of the municipal officer or body with "final policymaking authority" over the subject matter of the offending policy.'" *Id.* (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)); *see also Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003) ("Knowledge on the part of a policymaker that a constitutional violation will most likely result from a given official custom or policy is a *sine qua non* of municipal liability under section 1983.").

In addition, if the policy at issue is not facially unconstitutional, a plaintiff must also

show that it was adopted with deliberate indifference as to its known or obvious consequences. *James*, 577 F.3d at 617 (internal quotations and citations omitted). Deliberate indifference, in this context, "is a degree of culpability beyond mere negligence or even gross negligence; it 'must amount to an intentional choice, not merely an unintentionally negligent oversight.'" *Id.* at 617-18 (quoting *Rhyne v. Henderson County*, 973 F.2d 386, 392 (5th Cir. 1992); *Conner v. Travis County*, 209 F.3d 794, 796 (5th Cir. 2000)). The Fifth Circuit has emphasized that the moving-force and deliberate-indifference elements of municipal liability "must not be diluted, for '[w]here a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability.'" *James*, 577 F.3d at 618; *see also Snyder v. Trepagnier*, 142 F.3d 791, 796 (5th Cir. 1998) (quoting *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397 (1997)).

Here, Boyter contends that he was denied knee surgery because Brazos County had a policy of denying medical care to avoid costs. In particular, Boyter alleges that Brazos County failed to maintain adequate insurance coverage to cover medical costs and treatment for detainees when treatment was needed from specialists "outside the Jail." To prevail, Boyter "is required to prove intent — specifically, that one or more jail officials 'acted or failed to act with deliberate indifference to [his] needs.'" *Shepherd v. Dallas County*, 591 F.3d 445, 452 (5th Cir. 2009) (quoting *Hare*, 74 F.3d at 648). Boyter concedes, however, that Brazos County scheduled and paid for x-rays, lab tests, two examinations at St. Joseph's Express Care, three office visits with Dr. Seabolt, and an MRI. [Doc. # 58, Ex. 1, at 66-67, 177-78]. Boyter concedes further that, when Dr. Seabolt recommended surgery for Boyter's

27

right knee on July 13, 2009, Brazos County promptly scheduled that procedure for July 29, 2009, which was Dr. Seabolt's first available appointment. [Doc. # 58, Exs. 26-27, 31].

Boyter insists that the surgery was cancelled because Brazos County did not want to pay. The record reflects, however, that the surgery was cancelled because of an intervening event, namely, the order from TDCJ directing Brazos County officials to transfer Boyter to state custody. [Doc. # 58, Ex. 29]. Boyter concedes that, prior to the transfer, Brazos County paid for all of the care that he received, including the treatment by Dr. Seabolt. [Doc. # 58, Ex. 1, at 177-78]. Boyter also concedes that he entered a guilty plea on May 22, 2009, and that his transfer to TDCJ was imminent. Boyter does not allege specific facts showing that his transfer was scheduled pursuant to a policy of denying medical care or for any other improper reason. Boyter does not otherwise demonstrate that he was denied adequate medical care, or that care was delayed, with deliberate indifference to a serious medical condition due to a policy in place at the Brazos County Jail. Because Boyter fails to raise a genuine issue of material fact on this question, Brazos County is entitled to summary judgment on this issue.

## C.    Claims Against Kirk, Dicky, and Mann — Qualified Immunity

Boyter alleges that, as supervisory officials at the Jail, Defendants Kirk, Dicky, and Mann denied him knee surgery by transferring him to state prison on July 27, 2009, in compliance with TDCJ's request. As a result of the transfer, Boyter complains that he was unable to have knee surgery that was scheduled for July 29, 2009, and that his treatment was delayed until October 23, 2009. Defendants Kirk, Dicky, and Mann argue that they are

28

entitled to qualified immunity from liability for the claims against them in their individual or personal capacity.

Public officials acting within the scope of their authority generally are shielded from civil liability by the doctrine of qualified immunity. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity protects government employees against civil liability in their individual capacity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wernecke v. Garcia*, 591 F.3d 386, 392 (5th Cir. 2009) (quoting *Harlow*, 458 U.S. at 818)) (internal quotation marks omitted). "Even if a defendant's conduct actually violates a plaintiff's constitutional rights, the defendant is entitled to qualified immunity if the conduct was objectively reasonable." *Zarnow v. City of Wichita Falls, Tex.*, 500 F.3d 401, 408 (5th Cir. 2007) (quoting *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1183 (5th Cir. 1990)). Thus, the doctrine of qualified immunity "shields from civil liability 'all but the plainly incompetent or those who knowingly violate the law.'" *Manis v. Lawson*, 585 F.3d 839, 845 (5th Cir. 2009) (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)).

To determine whether a public official is entitled to qualified immunity for an alleged constitutional violation, reviewing courts engage in a two-prong inquiry. *See Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 815 (2009). The first prong of the analysis asks whether, taken in the light most favorable to the party asserting the injury, the facts alleged show that the official's conduct violated a constitutional right that was "clearly established" at that time. *See id.*, 129 S. Ct. at 815-16; *Scott v. Harris*, 550 U.S. 372, 377 (2007) (citation

omitted).   The second prong of the analysis asks whether qualified immunity is appropriate, notwithstanding an alleged violation, because the defendant's actions were objectively reasonable "in light of clearly established law at the time of the conduct in question." *Hampton Co. Nat'l Sur., L.L.C. v. Tunica County, Miss.*, 543 F.3d 221, 225 (5th Cir. 2008) (quoting *Freeman v. Gore*, 483 F.3d 404, 410-11 (5th Cir. 2007)).   A reviewing court may consider these prongs in any sequence.   *See Pearson*, 129 S. Ct. at 818.

In this instance, the defendants concede that Boyter was transferred to TDCJ on July 27, 2009, and that the surgical procedure with Dr. Seabolt that was previously scheduled for July 29, 2009, was cancelled.   The defendants maintain that there is no evidence that medical care was withheld or delayed with deliberate indifference in violation of Boyter's constitutional rights.   Boyter concedes that he was evaluated by an orthopedic specialist upon his intake to TDCJ and that he had arthroscopic knee surgery on October 23, 2009.[7]   There is no evidence that he was denied care following his transfer to state custody or that the delay actually resulted in any harm.   This is insufficient to demonstrate a constitutional violation. *See, e.g, Mendoza*, 989 F.2d at 195 (observing that a delay in medical care violates the

---

[7]        The record shows that Boyter was discharged from UTMB on October 23, 2009, following arthroscopic surgery that featured "ACL repair" to his right knee. [Doc. # 60, Ex. 18]. Boyter was given an "immobilizer" to wear and crutches. [*Id.*].   He was scheduled to return to the TDCJ "Ortho Clinic" in two weeks. [*Id.*].   A TDCJ Health Summary for Classification form reflects that, as of March 3, 2010, Boyter was assigned to work as a "counter attendant." [Doc. # 60, Ex. 19].   He had no restrictions on the type of facility, housing, or row of assignment, but was limited to "lower bunk" only. [*Id.*].   His only work restrictions were limited standing, no repetitive squatting, and no walking on wet or uneven surfaces. [*Id.*].   On June 4, 2010, Boyer was issued a "Gladiator Sport" brace for his right knee. [Doc. # 60, Ex. 19].   There is no evidence that any of these limitations were the result of delay.

constitution only if it is due to deliberate indifference and the delay results in "substantial harm"). Even assuming that a constitutional violation occurred, Defendants Kirk, Dicky, and Mann insist that they are entitled to qualified immunity nevertheless because they acted in good faith and Boyter cannot show that their actions were objectively unreasonable under the circumstances. Thus, the Court turns to the second prong of the qualified immunity framework and examines whether the defendants' conduct was objectively unreasonable.

The Court pauses to note that the usual summary judgment burden of proof is altered in the case of a qualified immunity defense. *See Gates v. Texas Dep't of Protective and Regulatory Servs.*, 537 F.3d 404, 419 (5th Cir. 2008). An official need only plead his good faith, which then shifts the burden to the plaintiff, who must rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law. *See Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005) (citing *Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001)). The plaintiff bears the burden of negating the defense and cannot rest on conclusory allegations and assertions, but must demonstrate genuine issues of material fact regarding the reasonableness of the official's conduct. *See Michalik*, 422 F.3d at 262; *see also Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379, 382 (5th Cir. 2009) (noting that, to avoid summary judgment on qualified immunity, a plaintiff need not present "absolute proof," but must offer more than "mere allegations") (quotation omitted).

To avoid summary judgment on the second prong of the qualified immunity defense, a plaintiff must present evidence to raise a fact issue "material to the resolution of the questions whether the defendants acted in an objectively reasonable manner in view of the

31

existing law *and facts available to them.*"  *Lampkin v. City of Nacogdoches*, 7 F.3d 430, 435 (5th Cir. 1993) (emphasis added).  If reasonable public officials could differ as to whether the defendants' actions were lawful, the defendants are entitled to immunity. *See Malley*, 475 U.S. at 341.

The record shows that, on May 22, 2009, Boyter entered a guilty plea to the burglary charges against him and received a 20-year prison sentence.  Prior to entering that plea, Boyter received medical treatment for his injured knee at the Jail, St. Joseph's Express Care, and Dr. Seabolt's office.  After Dr. Seabolt recommended knee surgery on July 13, 2009, Jail medical staff scheduled the surgery for July 29, 2009, which was the first available appointment. On July 22, 2009, however, TDCJ issued an order directing Brazos County officials to transfer Boyter, along with eight other convicted felons, to state custody on July 27, 2009. [Doc. # 58, Ex. 29].  Boyter and the other prisoners were transferred in compliance with TDCJ's order.  As a result, Boyter's knee surgery was delayed until October 23, 2009.

The record reflects that the transfer was requested by TDCJ, and was not initiated by a Brazos County official. [Doc. # 58, Ex. 29].  The defendants argue that compliance with the transfer order was reasonable because Boyter's condition did not appear serious.  As Jail Administrator Wayne Dicky explains in his affidavit, Brazos County complied with the order from TDCJ because "there was never an indication that the procedure was urgent, emergent, or non-elective." [Doc. # 58, Ex. 31].  Dicky states further that, without information from a doctor showing that Boyter's condition was serious, Brazos County "had no reason to attempt to circumvent the order from TDCJ and keep [Boyter] in County custody." [*Id.*].  Dr.

Seabolt, who recommended the surgery, confirms that Boyter's procedure was "elective" and "not an emergency." [Doc. # 59, Ex. 1, at 4].

As noted above, Boyter, as plaintiff, has the burden to produce admissible evidence that raises a genuine issue of material fact on whether the defendants' actions were objectively unreasonable under the circumstances in view of existing law and the facts known to them.  *See Michalik*, 422 F.3d at 262.  Boyter has filed a response to the summary judgment motion, but his pleadings do not overcome the defendants' assertion of qualified immunity. [Doc. # 60].  Boyter does not present any evidence or allege specific facts showing that Defendants Kirk, Dicky, or Mann knew, but deliberately chose to disregard, an urgent or emergent medical need by transferring Boyter to TDCJ on July 27, 2009.  Thus, Boyter has not shown that care was delayed with deliberate indifference to his condition. Boyter's conclusory allegation that Brazos County officials transferred him to avoid paying for the surgery is not supported by the record and does not raise a genuine issue of material fact on whether the transfer was done in bad faith.  In other words, Boyter has not overcome the defendants' assertion of qualified immunity in this instance because he does not allege specific facts showing that the actions taken by Defendants Kirk, Dicky, or Mann were objectively unreasonable under the circumstances.   Based on this record, Boyter's unsupported allegations are not sufficient to overcome the defendants' assertion of qualified immunity in this instance.  The Court concludes, therefore, that summary judgment on the defendants' assertion of qualified immunity is warranted.

## IV.    CONCLUSION AND ORDER

Based on the foregoing, the Court **ORDERS** as follows:

1.      The motion for summary judgment filed by Brazos County, Christopher Kirk, Wayne Dicky, and Jim Mann [Doc. # 58] is **GRANTED**.

2.      The motion for summary judgment filed by Dr. Rick Seabolt [Doc. # 59] is **GRANTED**.

3.      This case is dismissed with prejudice.

The Clerk will provide a copy of this order to the parties.

SIGNED at Houston, Texas, on March 28, 2011.

Nancy F. Atlas
United States District Judge